ARKANSAS PUBLIC SERVICE COMMISSION et al *v.* PULASKI COUNTY BOARD OF EQUALIZATION et al

79-25                                      582 S.W. 2d 942

Opinion delivered June 25, 1979

*Steve Clark,* Atty. Gen., by: *Jackson Jones,* Asst. Atty. Gen., for appellants.

*Friday, Eldredge & Clark,* by: *George Pike, Jr.,* for appellees.

*James A. Ross, Jr.,* of *Ross & Ross,* for amicus curiae Arkansas Assessors Association and J. D. West, Drew County Assessor.

*Cearley, Gitchell, Bogard, Mitchell & Bryant,* for intervenor, Arkansas Education Association.

CARLETON HARRIS, Chief Justice. The Pulaski County Board of Equalization instituted action with the Public Service Commission, hereafter called PSC, sitting as the State Board of Equalization, asking that the State Equalization Board and the Assessment Coordination Division undertake a full investigation of assessment practices statewide, make a report thereon, and order a reassessment and equalization of all taxable property of all the other 74 counties, to the end that all property will be taxed equally and uniformly at its true, actual, and market value as required by the Arkansas Constitution; that the Board take such steps as might be necessary to have Act 411 of 1973 and Act 188 of 1969 declared unconstitutional. After a public hearing, in which testimony was taken, the Commission found that it had jurisdiction over the matter; that in the opinion of the At-

torney General, the Constitution does not require that property be assessed at current market value; that the Constitution permits the General Assembly to provide for different tax treatment for different classes of property and that the two acts, 411 of 1973 and 188 of 1969, are valid. The Commission then observed, "In view of the Attorney General's opinion and the presumption that statutes are constitutional, we are obligated to carry out the legislative mandate embodied in Acts 411 and 188 and leave any question as to the constitutionality of the acts for the court."

A petition for review of the order of the Commission and the Assessment Coordination Division was filed with the Pulaski County Circuit Court, Second Division, and on trial, after preparing a well-considered opinion, the trial court held and directed:

1. That Act 188 of 1969 is declared unconstitutional and the Arkansas Public Service Commission and its Assessment Coordination Division shall not comply with such Act in enforcing uniform property assessments throughout the State.

2. That Act 411 of 1973 is declared unconstitutional and the Arkansas Public Service Commission and its Assessment Coordination Division shall not comply with such Act in enforcing uniform property assessments throughout the State.

3. That all assessment practices based on other than current market value are unconstitutional and the Arkansas Public Service Commission and its Assessment Coordination Division shall not employ such practices in enforcing uniform property assessments throughout the State, except as hereinafter provided.

4. That the Arkansas Public Service Commission and its Assessment Coordination Division shall:

a. Develop an implementation plan designed to bring all counties into full compliance with this Order by the end of calendar year 1984;

b. Provide in such implementation plan for an orderly and equitable procedure whereby 15 counties per year shall be reassessed each year using such market value manuals and schedules developed by the Assessment Coordination Division of the Public Service Commission as are approved by the Court. This reassessment process shall begin with those counties with the greatest disparity between assessed value and market value and proceed at the rate of 15 counties per year through all seventy-five counties. The counties shall be ranked in order of disparity between assessed value and market value using the following criteria:

(1) The official ratio study published January 1, 1979, by the Assessment Coordination Division of the Public Service Commission.

(2) The valuation manual currently used by the county to value property.

(3) The date of the most recent county-wide reassessment in the county.

c. Prepare and submit to this Court by December 1, 1979, copies of the implementation plan and all working manuals to be used therein; and

d. Submit annual reports beginning December 31, 1980, setting out the progress to date toward full compliance.

5. The reassessment shall take place for the first fifteen counties from January 1, 1980, through December 31, 1980, based on the value of property as of January 1, 1980. The values thus determined shall be used by the assessors for any increase or decrease in value of each property between January 1, 1980, and January 1, 1981. The remaining 60 counties shall be reassessed during the next four years on the same basis.

6. This Order is entered by consent of all parties[1] except AEA, without affecting the merits of their respective positions taken before this Court or on any subsequent appeal, except that the parties, other than AEA, stipulate that the program for compliance set out herein shall be the program used to the extent this judgment is affirmed on appeal of the constitutional questions presented.

The validity of Act 411 of 1973 and Act 188 of 1969 is dependent upon the meaning of Article 16, §5 of the Constitution of Arkansas. Accordingly, we are required to interpret that section in determining this litigation. Pertinent portions, here at issue, of the section provide as follows:

All property subject to taxation shall be taxed according to its value, that value to be ascertained in such manner as the General Assembly shall direct, making the same equal and uniform throughout the State. No one species of property from which a tax may be collected shall be taxed higher than another species of property of equal value[2] * * *

We are called upon to determine two questions:

I. Whether "value" as used in Article 16, § 5 of the Constitution of Arkansas, means "current use value" or "fair market, true or real value."

II. Whether the Legislature may constitutionally classify property with the result being that one "species" of property may be taxed on a different basis than another "species" of property.

---

[1] All other 74 assessors were made party defendants in the action filed with the PSC and the Arkansas Education Association was subsequently given permission to intervene.

[2] Additionally, the section provides that certain property shall be exempt from taxation, viz., "public property used exclusively for public properties; churches used as such; cemeteries used exclusively as such; school buildings and apparatus; libraries and grounds used exclusively for school properties; and buildings and grounds and materials used exclusively for public charity."

In a sense these two issues are inter-related, and this first point may require, to a certain extent, a discussion of the second point.

Because it is somewhat confusing, it is perhaps best to first explain the manuals that were being used. According to Mr. Marvin Russell, Director of the Assessment Coordination Division of the PSC, the assessors had been using a manual prepared in 1960. Another manual was prepared for 1972 and four or five counties, (not entirely clear), at that time, began using the 1972 manual because they had initiated re-appraisal programs; however, the other counties continued to use the 1960 manual, and this was the manual in general use in July, 1972. In 1973, Act 411 was passed by the General Assembly, this act providing that the assessment manual and standards promulgated by the Assessment Coordination Division for the valuation of real property in this state in effect as of July 1, 1972 (this was the 1960 manual in general use except for the five counties mentioned), should continue to be the assessment manual and standards to be followed by the department in making assessment ratio studies until such time as the department promulgated new or revised assessment manuals and standards and obtained approval thereof by the General Assembly. The 1960 manual which Act 411, in effect, directed to be used, contained appraisal guides based upon 1961 values for farm and timber land and 1956 values for residential construction. Accordingly, under Act 411, residential values were "frozen" as of 1956, and timber and farm land values were "frozen" as of 1961, and those counties which had started using the 1972 manual before July 1, 1972, as Russell stated, "were actually locked into it, involuntarily."[3]

While, according to Russell, the guidelines furnished by the manual in use at the direction of the legislature represent a minimum, actually, most of the assessors use the guidelines as a maximum. He further testified that, even though some

---

[3]Act 411 does provide that the assessors may use other acceptable appraisal or valuation methods which in their judgment provide for a more equitable assessment and appraisal of real and personal property (provided that these methods do not place the assessment below the years heretofore mentioned).

assessments have been raised above the minimum provided by the 1960 manual, the Assessment Coordination Division makes its audit on the basis of the 1956 and 1961 valuations.

Russell stated that the 1960 manual defines value as:

The amount of money or money's worth for which goods or services may be exchanged within a reasonable period of time, under conditions to which both parties to the exchange are able, willing and reasonably well informed. As defined by the courts, it is the highest price estimated in terms of money which a property will bring if exposed for sale in the open market, allowing a reasonable time to find a purchaser who buys with all knowledge of usage to which it is adapted and for which it is capable of being used. Frequently, it is referred to as the price at which a willing seller would sell and a willing buyer would buy, neither being under abnormal pressure.

So, except for Acts 411 and 188, this portion of the manual would pretty well provide for market value valuations.

Several studies of the ratio of assessed value to market value in particular years were mentioned in the testimony, the percentage varying all the way in one, from 2.66% to 13.93%; in another, from 2.66% to 16.87%; and in a third, from 3.98% to a high of 18.06%.

It is thus readily apparent that property is not being assessed at the same valuation throughout the state, and this actually applies to all kinds of property; in fact, the ratio of assessed value to market value appears to be different in almost every county.

So, it is clear that assessments are not "equal and uniform throughout the state" as required by the Constitution.

But the larger question relates to the meaning of the word "value," Article 16, § 5, requiring that "all property subject to taxation shall be taxed according to its value." An

illustration which is perhaps overly simple serves to drive home the meaning of the word "value." If an individual displays an article, be it an article of jewelry, an automobile, or even if a house is being sold, and is asked the question, "What is its value?", the answer, of course, is the value of that property today—not what it was worth in 1956 or 1961— or any other year. The constitutional requirement, it would appear, undoubtedly means "present value," because its value in some other year would almost certainly not be the same as the current value, and accordingly, if some other basis is used, would not be its true value at all. In addition, the failure to use present market value, but instead to use 1956 and 1961 values, likewise violates the provision that the same shall be "equal and uniform throughout the state," for the reason that the value of properties in some counties since those years has greatly increased, while in others there has been an increase, but not so great, and in still others, the increase in value has only been minimal. In other words, the ratio of increase in property values has been far from the same in all 75 counties.

But it is argued that the Constitution provides "that value to be ascertained in such manner as the General Assembly shall direct."

So it does—but it is apparent (from cases hereafter cited) that this provision means that the General Assembly may select the *method* for equalizing assessments, i.e., for reaching the true value of property, and not for the purpose of arriving at a lower value for some species of property.

It is interesting, and we think significant, that as far as the present subject is. concerned, all previous constitutions follow this same format. For instance, our first Constitution, adopted in 1836, uses the identical language heretofore quoted from Article 16, § 5, of the 1874 Constitution. The same is true of the 1861 Constitution and of the 1864 Constitution. The language varies in the 1868 Constitution, but provides:

Laws shall be passed taxing, by a uniform rule, all moneys, credits, investments in bonds, joint stock com-

panies or otherwise; and also all real and personal property, according to its *true value* in money;" (Our emphasis.)

This Constitution remained in effect for six years, at which time the 1874 Constitution was passed, which again uses the exact language of the Constitutions of 1836, 1861 and 1864. Accordingly, since the language is identical, it is worthwhile to observe what our earlier courts held relative to this provision.

In the early case of *Pike* v. *State*, 5 Ark. 204, decided in 1844, just eight years after the adoption of the 1836 Constitution, the court construed this same provision. The opinion was written by our first Chief Justice, Daniel Ringo. The legislature, for the purpose of raising revenue to support the state government, had enacted legislation which provided, *inter alia,* that a tax should be levied on all lands lying within this state (except those exempted by virtue of a compact between this state and the United States); *all town lots and the improvements thereon* and providing that all lands should be valued at the true value thereof. The court held certain provisions of this act invalid, due to the fact that improvements located on town lots *only* were taxed and stated, "If, for instance, a tax be imposed on brick houses, no house of that description can be legally exempt therefrom, but all such, whether situated in a city, town or village, or in the country, must contribute equally, that is, in proportion to their value, to the revenue of the State." The court added that the legislature possessed no power to restrict the operation of the law to particular lands or improvements as might be situated in some specified portion of the state, or in any sectional or legal division or sub-division thereof, the reason being that, under the Constitution, the tax imposed must be equal and uniform throughout the state. The court stated the rule to be:

From the view which we have taken, not only of the provision above quoted, but of every part of the constitution, we consider the rule there prescribed to be this, that property of every character and description upon which a State tax may be levied, must be taxed in proportion to its *real and true value,* and according to that

basis be made to contribute to the revenue of the State; and that no portion of any distinct genus or species of property upon which such tax is imposed, can ever be exempt therefrom. (Our emphasis.)

In *St. Louis IMS Ry. Co.* v. *Worthen*, 52 Ark. 529, 13 S.W. 524 (1890), the only relevant question in the case was whether the legislature violated the constitutional mandate of equal taxation for all species of property when it created a state board for the task of determining the value of railroad property, the local assessors determining the value of all other property. This court held that such a procedure did not violate the constitutional requirement of equal taxation for all property of equal value.

Quoting from a California case, the court said:

We are unable to see how the fact that the value of one kind of property is to be ascertained by one officer or board, and the value of another kind of property by another officer or board — each clothed with the duty and responsibility of ascertaining the *actual value* — can be held to operate a deprivation of legal protection to the owners of either kind of property. The State board in the one case, the Assessors and county boards in the other, are but different instrumentalities through which the same result is reached; the fair and just valuation by reference to the same standard, and, therefore, the equal and uniform valuation of property for purposes of taxation. (Our emphasis.)

Of course, in determining market value, there are many factors to be taken into consideration. In *American Bauxite Co.* v. *Board of Equalization*, 119 Ark. 362, 177 S.W. 1151, this court reversed the circuit court for relying upon income as the sole indicator of the value of the property in disregard of its actual market value. We mentioned several elements that could well be considered in determining market value, stating:

In the determination of the market value of a given piece of property, necessarily a great many things are to be

taken into account, and much of the voluminous evidence in this record is competent as bearing upon that question, although much of it tends only in a remote degree to the elucidation of that question. It is proper always in determining that question to take into account the character of the land; the uses to which it may be put; the character of the soil; the timber growing on the surface of the land as well as the ores hidden beneath; the accessibility of the land; its development; its proximity to other lands which have been so developed as to add to its own value; and the quantity of other lands of a similar character adjacent to it which would be calculated to make it more attractive to prospective purchasers, together with any other fact or circumstance which affects the property's value. *But all of these questions are to be considered for the purpose at last of ascertaining the market value of the tract in question, and that is the value which must be adopted for the purposes of assessment when it has been ascertained.* In determining the market value of ordinary non-mineral land, for instance, it would not be improper to consider the depth of the soil, the crops which could be profitably grown, and the relative prices of these crops. A prudent investor would consider the accessibility of any tract of land and its convenience to market, and he would also take into account the facilities for marketing his produce. So, also, with mineral lands, it would be proper to take into account the quantity of the ore, the facilities for, and cost of mining it, as well as any other fact or circumstance which would likely make such lands a more attractive proposition to a prospective buyer. But all these things are to be considered for the purpose only of ascertaining the market value of the land. (Our emphasis.)

Actually, up until the time of passage of Acts 411 and 188, the General Assembly seems to have recognized that our Constitution required the assessment of property on the basis of current market value. The opening sentence of Ark. Stat. Ann. 84-428 (Repl. 1960), which is part of an act passed in March, 1883, (nine years after the adoption of the Constitution) and a part of Chapter 4 listed "Assessment of Taxes," provides:

Each separate parcel of real property shall be valued at its true market value in money, excluding the value of crops growing thereon; but the price at which such real estate would sell at auction or at a forced sale shall not be taken as the criterion of such true value.

Ark. Stat. Ann. §84-426, passed in 1929, provides:

All property in this state shall be assessed by the duly authorized authorities according to its value on the first day of January. Provided, stocks of merchants and manufacturers shall be assessed at the value of the average stock in possession or under control during the year immediately preceding the first day of January of the year in which assessment is required.

Ark. Stat. Ann. §84-427, also passed in 1929, provides:

Every person in making his assessment shall assess all farm crops owned by him on the preceding July 31st, and according to its value of that date, instead of January 1st.

Certainly there is no reference to the value of the property at any time other than those dates, and it is clear that this act called for this procedure and this valuation to be made each year.

Of course, the General Assembly has the authority to enact any legislation not in conflict with Article 16, §5, and has full authority to set the percentage of market value that shall be used in making the assessment.

Ark. Stat. Ann. §84-476, passed in 1955, sets out:

The appraisal and assessment shall be according to value as required by Section 5 of Article XVI of the Constitution. *The per centum of true and full market or actual value to be used in the appraisal and assessment shall be fixed and certified by the Commission* as provided by sub-section (c) of Section 84-103, Arkansas Statutes, 1947;[4] provided

---

[4]This section provides that the Arkansas Public Service Commission shall have full power and authority in the administration of the tax laws of

that until and unless a budget system is adopted with provisions for eliminating excessive and illegal tax rates and expenditures, the Commission shall not fix and certify *a per centum of true and full market or actual value* in excess of twenty per centum (20%). (Our emphasis.)

It is thus apparent that the General Assembly, at least through 1955, recognized that value as used in §5 of Article 16, *meant true, market, or actual value.*

In accordance with what has been said, it is evident that we find Act 411 of 1973 unconstitutional, and we agree with appellees that this is true for several reasons. One, however, is sufficient. Under the Act, property is not assessed as to current market value, but instead, artificial 1956 values for residential and certain construction are used, and likewise, farm and timber land are valued as of 1961.

Much of what has been said necessarily applies equally to the second question, which, we commented initially, is linked with the first, *viz,* whether the legislature may constitutionally classify property, the result being that one species of property may be taxed on a different basis than another species of property.

Act 188, even more obviously than the one just discussed, plainly violates the constitutional provision that property shall be taxed according to its value, "making the same equal and uniform throughout the state." A few excerpts from the act clearly establish this fact. Section 1 provides:

Hereafter, all lands which are actively devoted to farm, agricultural or timber use shall be assessed for ad

the state now in force or such as may hereinafter be enacted and sub-section (c) provides that the Commission shall "file with the county judge, county clerk and county assessor of each county not later than ten [10] days before the time for the beginning of the assessment of property by the tax assessors a certificate showing the per centum of true and full market or actual value that it has used, or will use, in valuing for taxation for that year the property the Commission is required to assess; and it shall be the duty of the assessors and boards of review or equalization and county judges to adopt the same basis of valuation of property in their county for the purpose of taxation as that so certified by the Commission."

valorem tax purposes on the basis of such *current use*, and shall not be assessed as if subdivided or on any other basis.* * * (Our emphasis.)

Section 2, sub-sections (A) and (B), provide:

(A) Any owner desiring to have his farm, agricultural or timber land assessed according to its current use under the provisions of this Act shall make application to the county assessor of the county wherein the land is located on such forms as the county assessor shall direct. Such form must be filed between January 1 and July 1 during the calendar year immediately preceding that in which such classification is to begin. Such forms shall include only such information as shall be reasonably required to determine the entitlement of the applicant and each application shall include an affidavit that the statements contained therein are true.

(B) Upon the submission of the initial application if the county board of equalization of the county wherein the real property is located finds that the land qualifies under the provisions of this Act, it shall file notice of the same with the county assessor, and *the county assessor shall as to any such land make a notation on the assessment list and the tax roll each year of the assessed value of such land for the use for which it is classified in addition to the assessed value of such land were it not so classified,* and shall file notice thereof with the county tax collector. (Our emphasis.)

Sub-section (D) provides that once the land has been classified as farm property, it shall remain in that classification until there is a request by the owner that it be withdrawn from the classification, or until the assessor shall find that the land is used for other purposes. The legislation provides that the owner each year shall file an affidavit that the land is being used for farm, agricultural, or timber purposes.

The Act then sets out:

Any lands withdrawn from the above classification either by the owner or through failure of the owner to

file the required affidavit of use shall not be entitled to be classified again under this Act as farm, agricultural or timber lands until a four (4) year period has elapsed. If the land is either withdrawn from the above classification or the owner thereof shall fail to file an affidavit of use each year, *then the land shall be assessed and taxes collected thereon as non-farm, non-agricultural or non-timber lands.* (Our emphasis.)

In other words, farm, agricultural and timber lands, under Act 188, are taxed according to the *use* made of the property, and not the market value, which we have pointed out as the requirement under Article 16, §5 of the Constitution.

In *Little Rock & Ft. Smith Ry. Co.* v. *Worthen,* 46 Ark. 312, this court said:

The theory of our constitution is that the common burden shall be borne by common contributions. All property is to be taxed according to its value. 'All' does not mean all the legislature may designate, or all except such as the legislature may exempt. If this were so the whole burden of taxation might be thrown upon land, or upon any one species of property. It means all private property, of every possible description, or all property other than that belonging to the state, or the general government. *The legislature cannot discriminate between different classes of property in the imposition of taxes. The only discretion with which it is invested, is in the ascertainment of values, so as to make the same equal and uniform throughout the state.* (Our emphasis.)[5]

In *Hays* v. *MoPac Ry. Co.,* 159 Ark. 101, 250 S.W. 879, we said:

[5]Of course, Constitutional Amendment No. 57 was adopted in November, 1976, §1 providing: "The General Assembly may classify intangible personal peoperty for assessment at lower percentages of value than other property and may exempt one or more classes of intangible personal property from taxation, or may provide for the taxation of intangible personal property on a basis other than *ad valorem.*" § 2 provides: "The provisions of this amendment shall be in lieu of those provisions of Article 16, §5 of the Constitution of the State of Arkansas relating to the assessment and taxation of *intangible* personal property." (Our emphasis.)

It is true that property such as railroads may be classified for taxation and assessed by different methods and by different officers from those assessing other property. But the object is nevertheless the same, and that is to arrive at the value of the property and tax it according to its value, making the same equal and uniform throughout the State. While exact equality in taxation cannot be achieved, intentional inequality of assessments violates the mandate of the Constitution in question and invalidates the tax.

Likewise, in *Pulaski County Board of Equalization* v. *American Republic Life Ins. Cos.*, 233 Ark. 124, 342 S.W. 660, this court reiterated the constitutional requirement, stating:

> *The language of the constitution is too plain to be misunderstood:* 'No one species of property . . . shall be taxed higher than another species of property of equal value.' (Our emphasis.)

Professor Wade J. Newhouse, Jr., in his text, *Constitutional Uniformity and Equality in State Taxation* (1959), reviews the *ad valorem* tax laws of all the states.[6] As to Arkansas, he states:

> Property may be classified *for the purpose of using different methods in determining the value of the several classes.* It is important for comparative purposes to emphasize this because any indication found in the annotations or digests of cases to the effect that 'property may be classified for purposes of taxation' stems from the language found in the cases ruling on this particular point. Taken out of context, the language quoted in the annotations is misleading. But there is no confusion in the actual decisions of the Arkansas court. Any statements concerning the classification of property *were*

---

[6] This was prepared while Professor Newhouse was research assistant to the Legislative Research Center, University of Michigan Law School, and was completed during succeeding summers. Professor Newhouse states that he attempted to reflect all cases cited through the summer of 1956. At the time of publication, he was connected with the School of Law of the University of Buffalo at Buffalo, New York.

*made solely in relation to classification for the method of determining the value of property.* (Our emphasis.)

As pointed out throughout this opinion, almost from the beginning of our statehood, the word "value" in Article 16, §5, has been interpreted by this court as meaning current market value, and likewise, legislation enacted during this long period of years has consistently recognized that interpretation of the Constitution up until the time that Acts 411 and 188 were passed. Also, it is clear the Constitution provides that no one species of property from which a tax may be collected shall be taxed higher than another species of property of equal value, a provision which Act 188 clearly violates. We agree with the trial court that the provisions of both Act 411 of 1973 and Act 188 of 1969 are not in conformity with the constitutional provision herein discussed, and thus are unconstitutional, void, and of no effect.

In the final part of its order, the trial court, with the agreement of all parties except the Arkansas Education Association (and this last organization has not argued the matter in its brief), framed a remedy (to avoid undue disruptions) which allows until the end of 1979 for the PSC to complete preparation of an implementation plan and working manuals to be used therein, and further provides that a statewide reassessment program shall begin January 1, 1981, using 15 counties each year, as designated in the order, from that date until the program is completed.

As stated by the appellees, this remedy furnishes sufficient time for planning by the counties and the state to achieve a proper level of taxation by adjustment of millage, adjustment of the 20% ratio required, or by constitutional amendment. Since it is agreed upon by three of the four groups of parties and not affirmatively opposed by the fourth, we approve the agreement.

Affirmed.

BYRD, J., concurs; FOGLEMAN and HICKMAN, JJ., concur in part and dissent in part.

CONLEY BYRD, Justice, concurring. I concur in the result that Act 411 of 1973 and Act 188 or 1969 are unconstitutional. However, I do not agree that the term "value" in Art. 16, § 5 of the Constitution of Arkansas must be construed to mean "market value." The State could elect to tax all property according to its use and still comply with Art. 16, § 5, *supra*. However, the State cannot tax some properties at "market value" and other property at "use value" and still comply with Art. 16, § 5 because such a system inevitably results in some species of property being taxed higher than other species of property of the same value.

For the reasons herein stated, I concur only in the result.

JOHN A. FOGLEMAN, Justice, concurring in part, dissenting in part. It appears that the Pulaski County Equalization Board, or at least the Pulaski County taxpayers, along with taxpayers in some other counties, have a legitimate complaint about the disparity in assessed valuations over the state. If assessed value was the basis only for county taxes, perhaps the matter could be viewed in a different light, but that is not entirely the case. But there can be no question about the constitutional mandate to the General Assembly to prescribe a manner of determining values for taxation that would make them uniform throughout the state and such that no one species of property shall be taxed higher than another species of equal value. Art. 16, §5, Constitution of Arkansas.

Along with my brothers Byrd and Hickman, however, I must dissent from a substantial part of the majority's holding, and I subscribe to the concurring opinions without reservation, except that I feel that Act 411 of 1973 is constitutional.

I submit that the Attorney General's opinion that the Arkansas Constitution does not require that property be assessed at current market value was correct. In order to say that it does, something must be read into Art. 16, § 5 that is not there. This court has no power to so amend the constitution. I must agree, however, that the acts questioned have been unconstitutionally applied, to say the least.

Perhaps the majority, the trial court and appellees reached their conclusion that value necessarily means market value by commencing with the erroneous premise that the language of our present constitution and that of the 1868 constitution are of the same effect. They are not. Under the 1868 constitution, real and personal property were to be assessed according to its "true value in money." Nowhere in Art. 16, § 5 is anything said about true value, much less true value in money. Surely the drafters of the present constitution intended that "value" mean something other than "true value in money." If not, why did they not use the same language? Never has this court said that value in Art. 16, § 5 means market value. Even when the Constitution of 1868 was in effect, we did not say that property must be assessed at market value. If there is anything *Pike* v. *State*, 5 Ark. 204, does not hold, that is that property must be assessed at market value. In that case, Albert Pike did not want to have to pay taxes on his house in Little Rock, because the law provided that farm lands be assessed without reference to improvements. An act of the legislature required that improvements on town lots be assessed along with the land. This court certainly did not say that property was to be assessed according to market value, because it held that Pike only had to pay taxes on the value of the lots, exclusive of the improvements. That is not, was not, and cannot be, market value. How can one ignore a building on a tract of real property, particularly a town lot, in fixing its market value?

The foundation of the holding of the trial court and the majority of this court is the premise that "value" in Art. 16, § 5 means "market value." The fact that the General Assembly has, in some statutes, chosen market value as the manner in which value is determined does not mean that that branch of the government felt that it had a constitutional mandate to do so. It simply chose that manner as the best approach to a determination of value for certain types of property. It has not always done so. Long ago, it resorted to "use value" for some types of property. The General Assembly adopted an act in 1893, providing for the assessment of sleeping or dining car companies, express companies and telegraph companies. A "use" valuation for the purpose of taxation of these com-

panies was held valid under Art. 16, § 5. In *Wells, Fargo & Co's. Express* v. *Crawford County*, 63 Ark. 576, 40 S.W. 710, we treated the matter of taxation of express companies, saying:

* * * One object of this statute was to require that the property of such corporations should be assessed as a "unit profit-producing plant," and that their property in this state used in carrying on the corporate business should be assessed at its value when considered as a part of such unit or whole plant. The mere fact, therefore, that the assessment of the property of the company in this state was greater than the aggregate value of the safes, wagons, and other articles of property owned by the company in this state, when considered only as safes, wagons, etc., and *apart from the use to which they are put,* would not in itself justify us in concluding that the assessment was illegal and excessive. Much less does the allegation that the aggregate value of the articles of personal property owned by the company in Crawford county is less than the sum apportioned by the board to said county as the value of the property of appellant taxable in such county justify such a conclusion; for the value of the property of the company in this state, considered as part of a whole plant, and *in connection with the uses to which it is put, may be more than the aggregate value of the separate articles of personal property owned by the company here, when not considered in connection with the use to which the property is put. "The value of property results from the use to which it is put,* and varies with profitableness of that use, present and prospective, actual and anticipated." And it is the duty of the board to assess the property of the company at its true value, although that value may be in part due to the fact that such property is a portion of a large "profit-producing plant." *Railway Co.* v. *Backus,* 154 U.S. 421, 14 Sup. Ct. 1114. * * *

* * * The method provided for the assessment of this property was legal; for the legislature has the power to classify property for the purposes of taxation, and to provide for the valuation of different classes by different methods. Const. 1874, Art. 16, § 5; *Railway Co.* v. *Worthen,* 52 Ark. 529, 13 S.W. 254. The same reason exists for the separate classification of the property of ex-

press companies used in carrying on their business as exists in case of railway property. * * * [Emphasis mine.]

Appellees referred us to a definition of the word "value" in Black's Law Dictionary. The very first definition of the word given there is use value, not market value. It is:

The utility of an object in satisfying, directly or indirectly, the needs or desires of human beings, called by economists "value in use;" or its worth consisting in the power of purchasing other objects, called "value in exchange." [Citation omitted.] Also the estimated or appraised worth of any object or property, calculated in money.

Other definitions given in that dictionary include:

In economic consideration, the word "value," when used in reference to property, has a variety of significations, according to the connection in which the word is employed. It may mean the cost of a production or reproduction of the property in question, when it is sometimes called "sound value"; or it may mean the purchasing power of the property, or the amount of money which the property will command in exchange, if sold, this being called its "market value," which in the case of any particular property may be more or less than either the cost of its production or its value measured by its utility to the present or some other owner; or the word may mean the subjective value of property, having in view its profitableness for some particular purpose, sometimes termed its "value for use." * * *

See Black's Law Dictionary (DeLuxe 4th Ed.), p. 1721. Furthermore, the case upon which the dictionary definition adopted by appellees relies, does not support the definition they would have us use. That case was *Thaw* v. *Fairfield*, 132 Conn. 173, 43 A. 2d 65, 160 ALR 679 (1945). It involved assessments for the purpose of taxation. The Connecticut Supreme Court only said in that case that the ordinary basis for arriving at *true and actual* valuation is what the property

would bring in a fair market and not at a forced sale. That court recognized, in specific language, that the value of property is determined by many factors and, in the final analysis, is a matter of opinion, but, in its opinion, the best test is that of market sales.

The only mandate of Art. 16, § 5 is that all property be taxed according to value, i.e., on a valuation basis, and not some other basis. The value is to be ascertained in such manner and on such basis as directed by the General Assembly. It is not necessary that the value be full value, so long as valuations of property are equalized. *State* v. *Meek*, 127 Ark. 349, 192 S.W. 202. This section only requires that the burden of taxation be laid equally and uniformly on all property in proportion to its value, so that every property owner will contribute to the public revenue in proportion to the value of the property owned by him. *Pulaski County Board of Equalization Cases*, 49 Ark. 518, 6 S.W. 1. It has even been said that the constitutional requirement has been met when assessments are imposed equally upon all standing in the same relation. *Shibley* v. *Ft. Smith & Van Buren Dist.*, 96 Ark. 410, 132 S.W. 444.

The infringement on the rights of taxpayers purportedly represented by appellees is that use valuation is restricted to particular types or species of property, i.e., farm, agricultural and timber lands. Unfortunately, owners of these lands were not before the trial court. It appears clear, however, that regardless of the manner in which values are fixed by assessing authorities, the classifications of property for that purpose must not run counter to the fundamental requirement of equality in taxation prescribed by Art. 16, § 5, i.e., that all property of the same value be taxed at the same rates. *Pulaski County Board of Equalization* v. *American Republic Life Ins. Co.*, 233 Ark. 124, 342 S.W. 2d 660; *Pulaski County Board of Equalization Cases*, supra.

Achievement of equality and uniformity in taxation is an ideal which is unattainable, and all that the constitution requires is substantial or approximate equality and uniformity. *Peay* v. *City of Little Rock*, 32 Ark. 31; *Board of Directors of Crawford County Levee District* v. *Crawford County Bank*, 108 Ark. 419,

158 S.W. 149; *Shibley* v. *Ft. Smith & Van Buren District*, supra; *Pulaski County Board of Equalization* v. *American Republic Life Ins. Co.*, supra. But a system which obviously produces inequality violates the constitution. *Pulaski County Board of Equalization* v. *American Republic Life Ins. Co.*, supra. The requirements of Art. 16, § 5 extend beyond the rate of taxation to the mode of assessment. *Hays* v. *Missouri Pac. R. Co.*, 159 Ark. 101, 250 S.W. 879. The legislature cannot discriminate between different classes of property in the imposition of the tax burden. The only discretion with which it is invested is in the ascertainment of value so as to make the same equal and uniform throughout the state. *L.R. & F.S. Ry. Co.* v. *Worthen*, 46 Ark. 312, appeal dismissed 120 U.S. 97, 7 S. Ct. 469, 30 L. Ed. 588 (1886).

Act 188 of 1969 is unconstitutional, not because it permits agricultural and timber lands to be assessed for taxation only on the basis of their current use, but because it has resulted in an impermissibly unequal and non-uniform placing of the tax burden on those owners of property of a different species who must pay taxes on an assessed valuation based on market value. If as a result of the act, assessments are such that the burden of taxation falls more heavily upon one species of property than it does on another of equal value, it is unconstitutional. I must agree that there has been an adequate showing that this has resulted and that showing has been uncontroverted.

Act 411 of 1973 presents an entirely different problem. It requires the county assessor to use a manual and standards which appear to be out of date. It does not limit him to its use in making an assessment. It requires county boards of equalization to recognize and follow those manuals and standards, but the boards are not limited to them. A county judge is required to recognize and follow such manuals and standards only "to the extent he deems them applicable," just as the statute required before amendment by Act 411. The act specifically provides that the manuals and standards are for the *assistance* of the assessors and boards of equalization in making assessments and that both the assessors and the boards "may use other acceptable appraisal or valuation methods which, in their judgment, provide for a more

equitable assessment and appraisal of real and personal property." An equalization board may change an assessment made by an assessor only when necessary to provide uniformity in assessment of similar classes of property. The county judge may change one only when it is deemed necessary to provide for equitable assessment of the property to make it uniform with the assessment of similar classes of property in the county. As long as the various classes of property are valued on a uniform basis, there has been no infringement on the constitutional restrictions. The mere fact that the General Assembly required that the manuals and standards promulgated by the Assessment Coordination Department (Division) not be changed until new or revised manuals and standards had been submitted to, and approved by, the General Assembly does not make the act unconstitutional on its face. The General Assembly, by Act 411 of 1973, virtually required the Assessment Coordination Department to submit a manual and standards based upon pertinent and proper real estate valuation standards, i.e., cost factors, market conditions, actual or potential income-producing value and other acceptable valuation methods and procedures. The fact that this has not been done does not make the act facially unconstitutional.

I earnestly submit that Act 411 is not unconstitutional. The application of the act and the failure of the Assessment Coordination Department, or the Public Service Commission, to function may well have caused the unconstitutional disparity in valuations of property over the state. That department or its predecessors have been charged with the duty of equalizing assessments from county to county for quite a long time. See *Bank of Jonesboro* v. *Hampton*, 92 Ark. 492, 123 S.W. 753; *Arkansas Tax Commission* v. *Ashby*, 217 Ark. 759, 233 S.W. 2d 361; *State* v. *Meek*, 127 Ark. 349, 192 S.W. 202; Ark. Stat. Ann. § 84-714, et seq (Repl. 1960).

It is obvious that there is no equalization of assessments from county to county. The state equalization authorities have not functioned. It may be that the failure is because the legislature has not provided the funds or manpower. We cannot pass judgment on that question.

But it is obvious that there can be no equalization when the authorities charged with that duty abdicate in favor of each individual assessor. The evidence in this case shows clearly that in checking compliance of the county officials in each county, the representatives of the Assessment Coordination Department accept whatever standard the assessor in that county chose to follow, whether it was based on values in a 1960 manual, a 1972 version, or a 1976 revision, current values or whatever values struck that assessor's fancy. In most counties, if the assessor comes within 60% of market value on town lots, the Assessment Coordination Department approves. But in Pulaski and Jefferson Counties, the criterion is 100%. In Benton, Washington and Faulkner Counties, it is 75%. Uniform assessment is impossible when that practice is followed. The updating of the department manuals and standards could well result in a constitutional application of Act 411. I cannot agree that it is unconstitutional.

DARRELL HICKMAN, Justice, concurring in part, dissenting in part. I agree with the majority in every respect except one: the effective date of the judgment.

The trial judge originally entered his order, as a judge should, without regard to the mechanics of its implementation. Then, upon the urging of some of the parties (and I might add that the most important parties, the taxpayers, individual, corporate or farmer, and recipients of those taxes, were not privy to this arrangement), the court delayed implementation of the judgment over a period of 5 years. That is, beginning in 1981, 15 counties, the lowest in assessment-ratio, will comply first; then 15 counties the next year, and so on until all counties comply.

This means that for 5 years, 15 counties, and the taxpayers in those counties, will enjoy immunity from complying with the law. Conversely, 15 counties, and the taxpayers in those counties, will have to comply 5 years before 15 other counties.

This was done, at the urging of the Public Service Commission, to aid it in implementing a law that has existed for

over 100 years. Discrimination and unequal treatment in any form cannot be condoned or facilitated by the courts. (The trial judge said he was entering this modified order against his better judgment.) The legislative and executive branches of government are uniquely equipped and authorized to enact laws and carry them out — the judicial branch of government is not. We, as a court, should not ever consciously cross that line of the limits of our authority. The majority has done so, as did the trial judge, with good intentions; good intentions are often the reason for abuses of power.

It is the duty of the courts to make decisions; the other branches of government implement them. The trial judge was originally correct and should not have succumbed to the temptation to bail out the Public Service Commission from a problem it must solve.

I would modify the trial court's judgment to be effective as originally ordered.